**In the Matter of BOSTON AND MAINE CORPORATION, Debtor.**

**No. 70-250-M**

United States District Court, D. Massachusetts.

Oct. 4, 1984.

As Amended Oct. 5, 1984.

See also, D.C., 46 B.R. 965; D.C., 46 B.R. 974.

Edward I. Masterman, Cargill, Masterman & Culbert, Boston, Mass., for petitioner.

## MEMORANDUM

APPLICATION OF EDWARD I. MASTERMAN, COUNSEL TO THE TRUSTEES OF THE BOSTON AND MAINE CORPORATION, DEBTOR, FOR FINAL COMPENSATION FOR SERVICES RENDERED AND DISBURSEMENTS INCURRED

FRANK J. MURRAY, Senior District Judge.

The application of Edward I. Masterman, Esquire (the "Applicant"), for allowance of final compensation in the amount of $385,000.00 out of the Debtor's estate for services rendered, and expenses incurred in the sum of $1294.85, for the period October 1, 1965 through October 30, 1981, came on to be heard after due notice to creditors and

other parties in interest. The Interstate Commerce Commission, pursuant to 11 U.S.C. § 205(c)(2), has fixed the maximum limits within which allowance of compensation to the Applicant may be made, and has filed its decision with this court. Creditors and other parties in interest were afforded opportunity to be heard by the court at the hearing on the application. Absence of formal objection by creditors does not relieve the court of the responsibility of close and systematic scrutiny of the application to ensure that the allowance approved is within permissible limits. *See In re J.M. Wells, Inc.*, 575 F.2d 329 (1st Cir.1978).

Applicant seeks allowance of compensation and reimbursement of expenses out of Debtor's estate for services rendered by him, his partners and associates, before and after March 12, 1970, the date the petition for reorganization of Boston and Maine Corporation (the "B & M")[1] was filed, pursuant to Section 77 of the Bankruptcy Act (11 U.S.C. § 205).

Beginning October 1, 1965, the Applicant represented B & M with reference to possible takings of B & M upland, and revocation of certain B & M tideland licenses, by the Commonwealth of Massachusetts (the "Commonwealth") for the purpose of laying out an important segment of a major highway: Route I 695. On August 9, 1967 the Commonwealth made takings of 917,796 square feet of B & M upland, and on the same day the Massachusetts legislature enacted Chapter 534 of the Acts of 1967[2] providing for revocation of certain tideland licenses held by B & M. The Commonwealth offered a pro tanto payment in the amount of $1,025,000 for damages resulting from takings of the upland, and contended no damages were due B & M for revocation of the tideland licenses. On November 8, 1968 the Commonwealth, at the behest of B & M, reconveyed 237,942 square feet of upland taken on August 9, 1967, and thereupon reduced its pro tanto offer to $918,500.00. The Applicant commenced three actions for damages in the Massachusetts Superior Court in behalf of B & M against the Commonwealth in July 1969: one action for the taking of B & M upland in Somerville, one action for the taking of B & M upland in Charlestown, and the third action for revocation of the tideland licenses. On March 12, 1970 when the petition for reorganization of B & M was filed, the three actions had not been resolved and were pending in the Superior Court. The Debtor's trustees hired the Applicant to represent them in the actions as of March 27, 1972 pursuant to pre-existing court Order No. 105.[3] Trial of the actions commenced some eight years later on May 19, 1980 before a single judge without jury. On October 7, 1980 the judge entered his findings in the case and awarded to Debtor "the amount of $2,838,533.00 less any pro tanto paid, plus interest from the date of the taking plus costs". The Commonwealth then filed a claim for trial de novo before a jury, under Mass. Gen. Laws ch. 79, § 22 (as amended), and the judgment based on the findings of the single judge was vacated. Settlement of the cases in the amount of $2.0 million was agreed upon in August 1981. The Commonwealth issued a certificate of judgment to Debtor's trustees for $2.0 million on August 21, 1981, and delivered its check for $2,020,000.00 to the Debtor's trustees on October 28, 1981 in satisfaction of the judgment and post-judgment interest of $20,000.00.

The fee application, covering the period from October 1, 1965 through October 30, 1981, claims compensation for (a) pre-reorganization services rendered to B & M, and (b) services rendered as trustees' special counsel during the reorganization proceedings on actions against the Commonwealth which were unresolved and ongoing when the petition for reorganization was filed on March 12, 1970. No issue, other than the determination of the amount of compensation, arises as to allowance of compensation to Applicant for authorized services rendered as special counsel pursuant to Order

---

**1.** "B & M" describes the railroad corporation before the petition for reorganization was filed. The railroad corporation will be referred to as "Debtor" after the petition was filed.

**2.** *See* appendix A.

**3.** *See* appendix B.

No. 105. Additional questions arise, however, as to compensation allowable for pre-reorganization legal services.

■ No document or other evidence was submitted to the court that establishes terms of an express employment contract between Applicant and B & M. On the other hand, an implied agreement of retainer may be found from Applicant's representation of B & M when the Commonwealth made the takings of B & M property, and continuing thereafter. When Applicant commenced the state court actions he acquired an attorney's "lien for his reasonable fees and expenses upon his client's cause of action". Mass.Gen.Laws ch. 221 § 50. The security of the state law lien did not terminate when the petition for reorganization was filed, and was not terminated by action of the trustees. The lien did terminate when Applicant voluntarily accepted employment to prosecute the actions against the Commonwealth as trustees' special counsel pursuant to Order No. 105. From that time forward, services rendered by Applicant attributed to the estate, and the right to compensation therefor, were governed by 11 U.S.C. § 205 and not by state law.

On this application the court may determine the compensation due Applicant secured by the state law lien, and compensation due him from March 27, 1972 as trustees' special counsel. Applicant's requests for allowance of compensation for pre-reorganization services which rest on unsecured claims, or the invocation of general equitable powers of the court, are not cognizable on this fee application on the presentation made to the court.

■ The measure of compensation allowable here is reasonable compensation, whether based on the security of the attorney's lien or Applicant's role as special counsel for the trustees under 11 U.S.C. § 205(c)(2). Despite the Applicant's contention, the provisions of 11 U.S.C. § 330(a) of the Bankruptcy Code (1978), described in Applicant's memorandum as "the statutory imperative to determine fees related to the cost of similar services in a non-bankruptcy context", are not applicable to these reorganization proceedings. *See* 11 U.S.C. prec. § 101 (1978) (Savings Provisions).

■ The court's starting point in determining what is reasonable compensation is the usual approach: appraisal of the amount of time reasonably expended in providing legal services, and evaluation of such services by reasonable hourly rates.

The court has computed the actual time spent, which is cognizable on the application, as follows. The services embraced within the statutory lien commenced on August 9, 1967 and terminated on March 27, 1972, and in that period the application accounts for 805.25 hours. From March 27, 1972 to October 30, 1981, the period when Applicant served as trustees' special counsel, the application accounts for 2108.-75 hours of services rendered. Applying the actual hourly fee rates of Applicant, his partner and associates to the hours involved in the lien, the result is $41,995.00. Applying the actual hourly fee rates from 1972 through 1981 to the hours spent by Applicant, his partner and associates, the result is $190,537.50. The aggregate of these two results is $232,532.50, equivalent to the "lodestar" fee.

From August 9, 1967 until March 27, 1972, Applicant spent 362 hours on the problems that followed the takings, and on those that followed the revocation of the tideland licenses. He was assisted during this period by his partner, who spent 12.0 hours, and by his associates, who accounted for 431.25 hours. All of these hours (805.25) were reasonably expended in representing B & M in the matters related to the causes of action arising out of the takings and the revocation of licenses, and in the prosecution of actions brought against the Commonwealth.

From March 27, 1972 until 1975, the time spent by Applicant and his assistants was devoted mainly to research of facts, research of the law related to the valuation issue arising from the takings, and to the claim of compensation for revocation of the tideland licenses. Applicant devoted 19.75 hours in 1972 and 10.50 hours in 1974, assisted by one of his associates who expended 13.50 hours in 1972 and 15.25 hours

in 1974, on the cases against the Commonwealth. No time was spent on Debtor's cases by any of the attorneys in 1973. A notice of trial assignment was received from the clerk of court of the Middlesex Superior Court on September 15, 1975.

In late 1975 and thereafter, including 1980, the subject of trial assignment of the pending cases appears as a recurring item in numerous entries in the application, frequently the sole item. On November 10, 1976 a motion to consolidate the cases for trial was drafted. It is not clear from the application when the motion was allowed. The first settlement conference was held June 20, 1979, followed by others on July 23, 1979 and February 21, 1980. In December 1979 the deposition of the Commonwealth's expert was scheduled, and on January 8, 1980 the deposition was taken. Trial of the cases commenced on May 19, 1980. The Applicant included in the application an explanation for the cases not getting to trial at an earlier time. The explanation of "docket congestion" and "reasons beyond our control" would¹ be more convincing if it was shown that the trial court had been requested to advance the case for quick trial pursuant to Mass. Gen. Laws ch. 79, § 34.

In the period from March 27, 1972 to October 30, 1981, the Applicant devoted 678.25 hours to the pending cases, 218.25 hours were expended on them by Culbert (who became a partner in 1976), and 984.25 hours were spent on them by Tully (who joined the firm in 1975 as an associate). The total of these hours is 1880.75; of that number (1880.75), 1685 hours were expended in the years 1979, 1980 and 1981. The hourly rates of these three attorneys from and after 1972 are as follows:

| | 1972 | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 |
|---|---|---|---|---|---|---|---|---|---|
| Applicant | $ 65 | $ 85 | $ 85 | $ 85 | $ 85 | $100 | $130 | $130 | $150 |
| Culbert | 50 | 65 | 65 | 80 | 80 | 90 | 110 | 110 | 110 |
| Tully | — | — | 55 | 55 | 55 | 65 | 80 | 80 | 85 |

The average hourly rate, from 1972 to 1981, of Applicant for the 678.25 hours was $122.59 and of Culbert for the 218.25 hours was $95.61; Tully's average hourly rate from 1975 to 1981 for the 984.25 hours was $75.99.

No question was raised at the hearing before the court that the hourly rates of these attorneys were not fair and reasonable, or that the rates did not properly reflect the special skill and experience possessed by them.

Applicant contends that reasonable compensation allowable for services rendered in behalf of B & M and the Debtor's trustees should be enhanced above the "lodestar" fee. He argues that such enhancement is justified by the skill and ability of the attorneys rendering the services in these cases, the extensive experience possessed by them, the complexity of the matter, the novelty of the theories advanced, the extraordinary result achieved, and the benefit to the estate.

The court agrees that the quality of the work performed was high. It was not performed under time constraints, or under any difficulties as far as the court can determine. Research of substantial amount of factual matter was undertaken and detailed analysis and evaluation was made of the assembled data. Research of the law covered all relevant issues. The Applicant has admitted that valuation of the upland taken involved principles that were not entirely novel.

The Applicant's arguments made concerning the tideland licenses, the extent of the application of Mass.Gen. Laws ch. 91, and the effect of Chapter 534 of the Acts of 1967, were probably useful in the settlement proceedings, but the issue whether damages were recoverable from revocation of the licenses, and if so, to what extent, was never finally decided by a court. A substantial money settlement was accomplished. In eminent domain cases it is neither unusual nor extraordinary that the final monetary recovery will

appear quite large when compared with the pro tanto award. The question of benefit to the estate is not altogether clear. The Debtor was entitled to just compensation for the property taken, and no question was raised that the amount paid exceeded it.

 The spread between the final result and the pro tanto award is important in a case where the fee arrangement negotiated is strictly a contingent fee properly authorized by the client, but that is not the case here. No representation was made to the Applicant by the trustees or others that a contingent fee arrangement was a term of Applicant's employment. The trustees never suggested to the Applicant that in his employment he would be required to assume the risk of not recovering any fee whatsoever. He was advised by them that he would receive reasonable compensation for his services. Under the circumstances the affidavits in Exhibit D, as they refer to contingent fees, are informative but not applicable.

 Under the "lodestar" approach, the product of a reasonable number of hours of services rendered times a reasonable hourly fee rate normally provides a reasonable attorney's fee for the work performed. The burden of proving that the "lodestar" fee should be adjusted upward is on the applicant for the fee. There are two factual matters which do not appear to have been emphasized in the presentation to the court: the high quality of the brief submitted to the trial judge, and the large share of time spent, and the burden assumed at the trial on the tideland license issue, by Tully. Fifty-two percent of the hours devoted to Debtor's matters by the three attorneys from 1972 to 1981, which the court finds were of high quality, were expended by Tully. The court finds that the burden of persuasion of the claim for compensation for revocation of the tideland licenses was the heaviest burden in the task of seeking the damage award. The court adjusts upward the "lodestar" fee by increasing Tully's average hourly rate from $75.99 to $95.00, and allowing an addition to the average hourly fee for the brief. The Applicant is allowed total compensa-

tion of $260,000.00, and an Order to that effect shall be entered.

## APPENDIX A

Chap. 534. AN ACT REVOKING CERTAIN LICENSES AND AUTHORITIES IN CONNECTION WITH THE CONSTRUCTION OF INTERSTATE ROUTE 695 UNDER THE ACCELERATED HIGHWAY PROGRAM.

*Be it enacted, etc., as follows*:

SECTION 1. Pursuant to the provisions of section fifteen of chapter ninety-one of the General Laws, every license and authority granted since eighteen hundred and sixty-eight by the commonwealth to the Boston and Maine Railroad or to any other person, firm or corporation or to its or their predecessors in interest or to any other person to whose rights in connection with any such license or authority the said Boston and Maine Railroad or such other person, firm or corporation has succeeded, to build a structure or structures or to do other work upon certain land in Boston harbor and the Charles river over which the tide ebbs and flows or formerly ebbed and flowed and to fill up or to enclose the same or any portion thereof, is hereby revoked, to the extent that they were not revoked by the provisions of chapter eight hundred and nineteen of the acts of nineteen hundred and fifty and chapter seven hundred and ninety-one of the acts of nineteen hundred and sixty-three. Said land is shown on a preliminary plan entitled "Commonwealth of Massachusetts, Department of Public Works, Interstate Route 695, Boston, Plan of land in Charlestown Section of Boston, showing Commonwealth Tidelands," January 1967, and containing two parts, on file with the department of public works, a copy of which is filed in the office of the state secretary; and said land is bounded and described as follows: area west of Warren Avenue beginning at a point on the seawall which runs along the North side of the Charles River; thence running in a Northwesterly direction along a line denoted as Southwesterly Location Line 1967 on the said preliminary plan to a point; thence running in three courses,

Southwesterly, Northwesterly and Northeasterly respectively to a point: thence turning and running in a Northwesterly direction along a line denoted as Southwesterly Location Line 1967 to a point opposite station 130 + 10; thence turning and running southwesterly to a point; thence turning and running northwesterly to a point; thence turning and running northeasterly to a point on the low water line of the year 1647; thence turning and running in a general easterly and northeasterly direction along said low water line to a point on the Northerly Location Line, 1967 as delineated on said plan; thence turning and running in a general easterly direction along said Northerly Location Line, 1967 delineated on said plan, to a point on the low water line of year 1647; thence turning and running Southeasterly along said low water line to a point; thence turning and running along an area of granted land in successive courses of Southwesterly, Southeasterly and Northeasterly direction to a point on the low water line of year 1647; thence turning and running in a Southeasterly direction along said low water line of year 1647 to a point; thence turning and running along an area of granted land in successive courses of Southwesterly, Southeasterly and Northeasterly direction to a point on the low water line of year 1647; thence turning and running in a Southeasterly direction along said low water line of year 1647 to a point; thence turning and running in a Southwesterly direction along a line delineated tideland limits (1950) to a point; thence turning and running in a Southeasterly direction to a point, said point being on a line denoted as the Easterly Location Line, 1950, 1967; thence turning and running in a general Southerly direction along said Easterly Location Line to a point on the seawall, which runs along the North side of the Charles River; thence turning and running in a Westerly direction along said seawall to a point of beginning. Area Northwest of Austin Street—beginning a point approximately four hundred and eighty feet (480 ft.) northwest of Austin Street on the line denoted as the Southwesterly Location Line and thence running northwesterly along said line to a point on a line denoted as low water; thence turning and running in a general northerly direction along said line delineated as low water to a point on a line denoted as the Northerly Location Line: thence turning and running in a southeasterly direction along said Northerly Location Line to a point on a line denoted as low water; thence turning and running along said line delineated as low water in a general southerly direction to the point of beginning. Said land being presently used by said Boston and Maine Railroad and by persons claiming by, through, or under it or them.

So much of the following designated licenses as has not herein previously been revoked within the area of the above described land by the provisions of chapter eight hundred and nineteen of the acts of nineteen hundred and fifty and chapter seven hundred and ninety-one of the acts of nineteen hundred and sixty-three, but not expressly limited to said licenses, is hereby revoked: —(a) Harbor and Land Commissioners licenses numbered 21, 39, 40, 81, 86, 90, 122, 127, 132, 179, 210, 255, 300, 316, 316a, 344, 359, 402, 419, 531, 574, 734, 1145, 1546, 1561, 1587, 1940, 3116, 3150; (b) Directors of the Port of Boston license numbered 179; and (c) Massachusetts Department of Public Works licenses numbered 181, 281, 283, 341, 341a, 968, 2618, 2683, 2719, and 3386.

SECTION 2. Any compensation which has been paid to the commonwealth under the provisions of section twenty-two of said chapter ninety-one of the General Laws or under any similar provision of law shall be repaid to the Boston and Maine Railroad and to any other person, firm or corporation lawfully entitled thereto in accordance with the provisions of section fifteen of said chapter ninety-one of the General Laws or under any similar provisions of law to the extent that the right and privileges for which it has been paid are terminated by the revocation of the licenses and authorities as provided in section one. Such repayment shall be made from funds authorized under the provisions of chapter six hundred and seventy-nine of the acts of

nineteen hundred and sixty-five or any subsequent acts thereto. In the event of a disagreement as to the amount of compensation to be paid hereunder, the Boston and Maine Railroad or any other person, firm or corporation lawfully entitled thereto, or the commissioner of public works, may, within two years from the effective date of this act, petition the superior court of the county of Suffolk for a determination thereof.

*Approved August 9, 1967.*

THE COMMONWEALTH OF MASSACHUSETTS,

EXECUTIVE DEPARTMENT, STATE HOUSE,

BOSTON, August 9, 1967.

The Honorable KEVIN H. WHITE, *Secretary of the Commonwealth, State House, Boston, Massachusetts.*

DEAR MR. SECRETARY: —I, John A. Volpe, pursuant to the provisions of Acticle XLVIII of the Amendments to the Constitution, the Referendum II, Emergency Measures, hereby declare in my opinion the immediate preservation of the public convenience requires that the law being Chapter 534 of the Acts of 1967, entitled "An Act Revoking certain Licenses and Authorities in connection with the Construction of Interstate Route 695 under the Accelerated Highway Program." and the enactment of which received my approval on August 9, 1967, should take effect forthwith.

I further declare that in my opinion said law is an emergency law and the facts constituting the emergency are as follows:

Delayed operation of this act would impede the Department of Public Works in its land takings and subsequent construction in order to close the missing link of the highway system in Route 93 and the Central Artery.

Sincerely,
JOHN A. VOLPE,
*Governor of the Commonwealth.*

OFFICE OF THE SECRETARY, BOSTON, August 10, 1967.

I, Kevin H. White, Secretary of the Commonwealth, hereby certify that the accompanying statement was filed in this office by His Excellency the Governor of the Commonwealth of Massachusetts at ten o'clock and twenty minutes, A.M., on the above date, and in accordance with Article Forty-eight of the Amendments to the Constitution said chapter takes effect forthwith, being chapter five hundred and thirty-four of the acts of nineteen hundred and sixty-seven.

KEVIN H. WHITE,
*Secretary of the Commonwealth.*

## APPENDIX B

*In Proceedings for the Reorganization of a Railroad*

ORDER NO. 105

ORDER AUTHORIZING THE TRUSTEES TO APPOINT AND SUBSTITUTE SPECIAL COUNSEL FOR EMINENT DOMAIN PROCEEDINGS AND OTHER LITIGATION PURPOSES

The petition of the Trustees of the property of the Debtor for authority to appoint and substitute Special Counsel for eminent domain proceedings and other litigation purposes having come on for hearing on March 27, 1972, duly noticed pursuant to the order of this Court and the parties in interest having been heard, and the Court being duly advised in the premises, it is

ORDERED, ADJUDGED and DECREED:

1. That the Trustees be, and they hereby are, authorized to appoint and substitute Special Counsel to represent the Debtor's interests in eminent domain proceedings and other types of court and administrative litigation;

2. That the Trustees be, and they hereby are, authorized, in their discretion, to pay or satisfy bills from said Special Counsel for amounts of less than $5,000.00.

WITNESS the Honorable Francis J.W. Ford, Judge of said Court, and the seal thereof, this 27 day of March, 1972.

/s/ Francis J.W. Ford
Judge